IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAVID HACKETT,<br><br>            Plaintiff,<br><br>vs.<br><br>WARDEN CHARMAINE BRACY,<br><br>            Defendant. | CASE NO. 4:21-cv-2337<br><br>DISTRICT JUDGE<br>CHARLES E. FLEMING<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT AND<br>RECOMMENDATION** |

David Hackett filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Hackett is currently in custody at the Allen Correctional Institution serving a sentence of life without parole imposed by the Mahoning County Court of Common Pleas in *State v. Hackett*, Case No. 13-CR-1125. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Hackett's petition.

## Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id.*

The Ohio Court of Appeals for the Seventh Appellate District

summarized the facts underlying Hackett's conviction as follows:

> {¶6} Around 8:00 a.m. on October 14, 2013 the body
> of a Jane Doe was discovered on the access road to
> the Water Department off of North West Avenue in
> Youngstown, Ohio. The victim was found naked
> except for a brassiere and had been stabbed multiple
> times. A knife was located in the vicinity of the body.
> 5/30/17 Trial Tr. 266.
>
> {¶7} Later in the afternoon, Ruth Weaver and
> Appellant went to the police station to report a
> person living with them, C.C., as missing. Weaver
> saw on the news that a body was found and
> recognized the necklace; the necklace belonged to
> C.C. Weaver and Appellant were able to identify the
> Jane Doe as C.C.
>
> {¶8} The victim had been living with Weaver, her
> seven children, and Appellant at 165 New York
> Avenue in Youngstown for a few months prior to her
> death. The victim was a drug addict and was often
> "dope sick" while she was staying with them.
> Allegedly, the victim worked at a gentlemen's club,
> made and sold methamphetamine, and stole things
> to support her habit. Appellant allegedly was her
> drug dealer.
>
> {¶9} Appellant and Weaver were interviewed by the
> police on October 16, 2013. Appellant claimed that
> from 7:00 p.m. to 9:00 p.m. on October 13, 2013 he
> was in Salem, Ohio. 5/30/17 Trial Tr. 417. Weaver
> was interviewed separately and stated Appellant
> was at church with her and then went to get her an
> iced coffee. 5/30/17 Trial Tr. 420-421. The officer who
> conducted both interviews indicated there was
> nothing consistent between Appellant and Weaver's
> stories. 5/30/17 Trial Tr. 422. During the interview,

Weaver was shown the knife found near the victim's body; she stated it was Appellant's knife. 5/30/17 Trial Tr. 423. Both Appellant and Weaver's cell phones were taken.

{¶10} During the investigation, the police used records from Weaver, Appellant, and the victim's cell phones to determine where each person's phone was on the evening of October 13, 2013. The police also used the phones to see the text messages between the three of them. The victim's phone was not recovered, so records from the phone carrier were used. Likewise, text messages were deleted from Appellant and Weaver's phones. The police were able to recover some text messages from Appellant's phone, but were not able to recover any from Weaver's phone.

{¶11} The GPS from the victim's phone indicated that at 8:05 p.m. on October 13, 2013 the phone was in the area where her body was found the next day. Her phone was there for approximately 1 hour before it was removed. 5/30/17 Trial Tr. 472. After that, the GPS from the phone indicated it travelled to the Weathersfield area of Meridian Road. 5/30/17 Trial Tr. 477. At that point the battery ran out or it was turned off. 5/30/17 Trial Tr. 477. The records from Appellant's cell phone indicate his phone was in the same area of the victim's phone from 8:00 p.m. to 9:00 p.m. on October 13, 2013. 5/30/17 Trial Tr. 473. The phone records indicated the phone was not in Salem, Ohio. 5/30/17 Trial Tr. 483. Weaver's phone was not in the area of where the victim's body was found on October 13, 2013 between 8:00 p.m. and 9:00 p.m. 5/30/17 Trial Tr. 479.

{¶12} There were frequent short text messages between Appellant and the victim prior to her death. 5/30/17 Trial Tr. 481. Those text messages indicated the two had planned to meet prior to the victim's death to use drugs. According to the text messages they had planned to take the vehicle with a "curtain." Surveillance video recovered from a business close to where the victim's body was found

3

showed a dark conversion van entered the property around 8:00 p.m. on October 13, 2013 and left around 9:00 p.m. There were text messages between Weaver and Appellant during and after that time. 5/30/17 Trial Tr. 485. Those text messages were deleted and the police were not able to recover them. 5/30/17 Trial Tr. 485.

{¶13} A conversion van was found at Appellant's residence on October 16, 2013. 5/30/17 Trial Tr. 412. The police searched the van and took samples of blood found in the van. The victim's DNA was found on the steering wheel. 5/30/17 Trial Tr. 517.

{¶14} After the interview with police, Weaver allowed the police to search her residence. A pair of jeans Appellant wore on the night of October 13, 2013 were recovered from the house; testing was performed on the jeans. There was blood found on the jeans and the results indicated it contained the victim's DNA. 5/30/17 Trial Tr. 512. The waistband of the jeans was tested and it contained DNA from both the victim and Appellant. 5/30/17 Trial Tr. 512.

{¶15} The knife that was recovered from the area where the victim's body was found was also tested. Weaver identified this knife as Appellant's knife. There was a blood stain on the knife blade that contained the victim's DNA. 5/30/17 Trial Tr. 510. An additional swabbing from the blade contained Weaver's DNA. 5/30/17 Trial Tr. 510. Appellant was excluded as a contributor to the DNA found on the knife blade. 5/30/17 Trial Tr. 510. Samples were taken from the handle of the knife. 5/30/17 Trial Tr. 510. It was determined that the DNA found on the handle was from more than one person, however the victim was a major contributor of the DNA. 5/30/17 Trial Tr. 510.

{¶16} An autopsy of the victim's body was performed and samples were taken for a sexual assault kit. The medical examiner indicated the victim had been stabbed 81 times and observed defensive wounds. 5/30/17 Trial Tr. 626, 631. The knife that was found

4

at the scene was determined to be consistent with the knife that inflicted the victim's wounds. 5/30/17 Trial Tr. 640. Only two of the stabs wounds were lethal; one stabbing to the carotid artery and another stabbing to the right collarbone region. 5/30/17 Trial Tr. 632-633. The cause of death was lack of oxygen to her body. 5/30/17 Trial Tr. 634. The stabbing of the carotid artery caused lack of blood flow to her brain and thus, a lack of oxygen to her brain. 5/30/17 Trial Tr. 633. There was also severe damage to her left lung, which additionally meant she was not getting oxygen to her body. 5/30/17 Trial Tr. 634. Some of the stab wounds happened after or near the time of death. 5/30/17 Trial Tr. 638. It could not be determined in which order the wounds occurred; however, it was determined that incapacitation would have happened within 60 seconds to 2 minutes of the first of either fatal wound. 5/30/17 Trial Tr. 639, 646. The manner of death was classified as homicide. 5/30/17 Trial Tr. 643.

{¶17} The autopsy included a toxicological analysis and three major drugs were found in the victim's system – amphetamines, cocaine, and morphine. 5/30/17 Trial Tr. 635. The amphetamines included methamphetamine, amphetamine, and pseudoephedrine, which are commonly present in Ecstasy. 5/30/17 Trial Tr. 635-636. The morphine found in her system was specific to heroin. 5/30/17 Trial Tr. 637.

{¶18} Testing performed on the vaginal swab determined Appellant and all of his male paternal relatives could not be excluded as a possible contributor to that DNA. 5/30/17 Trial Tr. 590-591.

{¶19} Appellant was indicted for aggravated murder, a violation of R.C. 2903.01(B)(F); rape, a violation of R.C. 2907.02(A)(2)(B); and two counts of kidnapping, violations of R.C. 2905.01(A)(2)(C) and R.C. 2905.01(A)(4)(C). 10/24/13 Indictment. The aggravated murder count included four death penalty specifications – R.C. 2929.04(A)(3), R.C.

5

2929.04(A)(5) and two R.C. 2929.04(A)(7) specifications. The rape and kidnapping counts included repeat violent offender specifications as enumerated in R.C. 2941.149.

{¶20} Appellant pled not guilty to the charges and was represented by two appointed counsel – Attorney Maro and Attorney DeFabio. In 2016, the state moved to dismiss the death specifications, which was granted. 1/22/16 Motion; 1/28/16 J.E. As a result, Attorney Maro was dismissed from the case, and the case proceeded with Attorney DeFabio representing Appellant. 1/28/16 J.E. Jury trial was scheduled for January 18, 2017. On that date, Appellant orally moved to proceed pro se and for a continuance. 1/20/17 J.E.; 1/18/17 Tr. 2. After a colloquy with Appellant, the trial court granted the request and ordered Attorney DeFabio to be standby counsel. Tr. 1/20/17 J.E.; 1/18/17 Tr. 9-16. Trial was set for May 30, 2017. 1/20/17 J.E.

{¶21} On March 31, 2017 Appellant filed a pro se request for full assistance of standby counsel. 3/31/17 Motion. A hearing was held on this motion and the trial court explained the role of standby counsel and that it does not include hybrid representation. 3/31/17 Tr. 5. The motion was overruled. 4/14/17 J.E. A written waiver of counsel was executed and filed on April 13, 2017.

{¶22} The trial proceeded on May 30, 2017. Appellant was found guilty of all offenses and of the repeat violent offender specifications. 6/9/17 J.E.; 6/12/17 J.E. Appellant was sentenced to life without parole for aggravated murder and eleven years for rape. The two kidnapping counts merged with the aggravated murder count for purposes of sentencing. Appellant was advised that as part of his rape sentence he would be subject to three years of postrelease control and he was advised of the consequences of violating postrelease control. 6/9/17 J.E.

6

*State v. Hackett*, 2019-Ohio-1091, 2019 WL 1402894, at *1–3 (Ohio Ct. App. 2019).

## Procedural background

*Trial court proceedings*

As described above, a Mahoning County grand jury indicted Hackett in October 2013 on one count of aggravated murder, one count of rape, and two counts of kidnapping, with the noted death-penalty and repeat-violent-offender specifications. Doc. 7-1, at 5–7. As also noted, Hackett's case proceeded to trial, he was convicted on all counts, and he was sentenced to life without parole on the murder conviction and eleven years' imprisonment on the rape conviction.[1] *Id.* at 193–95.

*Direct appeal*

Hackett filed a timely notice of appeal with the Ohio court of appeals. Doc. 7-1, at 197. In his supporting brief, Hackett raised five assignments of error:

> 1. The trial court deprived Appellant of his right to counsel, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by failing to make sure that his waiver of counsel was made knowingly, intelligently and voluntarily.
>
> 2. Appellant was denied his Sixth Amendment right to counsel when the trial court incorrectly limited the role of stand-by counsel.

---

[1]     The trial court later amended its judgment as to the period of Hackett's post-release control. Doc. 7-1, at 196.

7

3. Appellant's conviction for rape was based on insufficient evidence and/or was against the manifest weight of the evidence.

4. Appellant's convictions for kidnapping were based on insufficient evidence and/or were against the manifest weight of the evidence.

5. The trial court committed plain error in instructing the jury on a theory of kidnapping that Collena was removed from one place to another, as to each of the kidnapping counts, that it had dismissed by way of Crim. R. 29, thereby depriving Appellant of a fair trial and due process as contemplated by both the State and United States Constitution.

*Id.* at 199. The court of appeals affirmed Hackett's conviction in late March 2019. *Hackett*, 2019 WL 1402894.

In May 2019, Hackett filed a notice of appeal with the Ohio Supreme Court. Doc. 7-1, at 291–92. In his memorandum in support of jurisdiction, Hackett raised four propositions of law:

1. Appellant's conviction for rape was based on insufficient evidence and/or was against the manifest weight of the evidence, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

2. Appellant's convictions for kidnapping were based on insufficient evidence and/or were against the manifest weight of the evidence, in violation of his Due Process protections under the Fourteenth Amendment to the US Constitution and Article I, Section § 10 of the Ohio Constitution.

3. The trial court deprived Appellant of his right to counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by

> failing to make sure that his waiver of counsel was
> made knowingly, intelligently, and voluntarily.
>
> 4. Appellant was denied his constitutional Sixth
> Amendment right to counsel when the trial court
> incorrectly limited the role of standby counsel.

Doc. 7-1, at 294. In July 2019, the Ohio Supreme Court "accept[ed] the appeal

on" Hackett's fourth proposition of law. *Id.* at 344.

The following month, the State moved to dismiss Hackett's appeal as

improvidently granted. *Id.* at 345–61. After the court denied the State's

motion, *id.* at 371, Hackett filed a merits brief, in which he argued that:

> A person who is a defendant in a criminal trial is
> denied the Sixth Amendment right to counsel when
> the trial court incorrectly limits the role of standby
> counsel.

*Id.* at 373. The Ohio Supreme Court affirmed Hackett's conviction in mid-

December 2020. *State v. Hackett*, 172 N.E.3d 75 (Ohio 2020). Hackett did not

seek review before the United States Supreme Court.

*Application to reopen appeal*

Meanwhile, in June 2019, Hackett filed in the Ohio court of appeals an

application under Ohio Appellate Rule 26(B) to reopen his direct appeal.[2]  Doc.

---

[2]     Rule 26(B)(1) provides:

> A defendant in a criminal case may apply for reopening
> of the appeal from the judgment of conviction and
> sentence, based on a claim of ineffective assistance of
> appellate counsel. An application for reopening shall
> be filed in the court of appeals where the appeal was
> decided within ninety days from journalization of the
> appellate judgment unless the applicant shows good
> cause for filing at a later time.

7-1, at 514–25. Hackett argued that his appellate counsel was ineffective for "fail[ing] to raise winnable issues in the direct appeal." *Id*. at 515. Hackett argued that counsel "failed to adequately support claims" raised as to Hackett's rape and kidnaping charges. *Id*. at 515–19. Hackett then described five new claims that he proposed to raise in a reopened appeal. *Id*. at 520–24. The Ohio court of appeals denied Hackett's application in September 2019. *State v. Hackett*, 2019-Ohio-3726, 2019 WL 4413335 (Ohio Ct. App. 2019). Hackett did not seek review before the Ohio Supreme Court.

In April 2021, Hackett filed a delayed motion under Ohio Appellate Rule 26(A), asking the Ohio court of appeals to reconsider its decision denying his application to reopen. Doc. 7-1, at 567–72. The Ohio court of appeals denied reconsideration because Hackett failed to "establish[] extraordinary circumstances that would justify an untimely application for reconsideration." *Id*. at 585. And even if he had shown extraordinary circumstances, the result would not change because Hackett's argument that the court failed to "consider the issue of standby counsel or hybrid representation under the Ohio Constitution" failed because he had not previously raised the issue. *Id*. at 586. Hackett did not seek review before the Ohio Supreme Court.

*Motion for release of information*

In November 2021, Hackett filed in the trial court a "motion for release of information." Doc. 7-1, at 587–90. In the motion, he sought the release of two video discs containing two witness interviews conducted by law enforcement

10

authorities. *Id*. at 587. The trial court denied the motion shortly after Hackett filed it. *Id*. at 599. Hackett did not appeal the trial court's order.

*Federal habeas proceedings*

Hackett filed petition for writ of habeas corpus in early December 2021. Doc. 1, at 18; *see Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that an imprisoned petitioner's petition is deemed filed when he places it in his prison's mailing system). He raises seven grounds for relief:

> GROUND ONE: There was insufficient evidence to support Petitioner's conviction for rape, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution.

> GROUND TWO: There was insufficient evidence to support Petitioner's convictions for kidnapping, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution.

> GROUND THREE: There was insufficient evidence to support Petitioner's conviction for aggravated murder, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution.

> GROUND FOUR: The trial court deprived Petitioner of his right to counsel pursuant to the Sixth and Fourteenth Amendments to the U.S. Constitution by failing to make sure his waiver of counsel was made knowingly, intelligently, and voluntarily.

> GROUND FIVE: Petitioner was denied Due Process under the Fourteenth Amendment and his right to counsel under the Sixth Amendment to the U.S. Constitution, when the trial court incorrectly limited the role of standby counsel.

GROUND SIX: Petitioner's rights to Due Process and a fair trial under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when the trial court provided improper instructions to the jury regarding the Count One charge of aggravated murder.

GROUND SEVEN: Petitioner's rights to Due Process and a fair trial under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when the trial court appointed a private investigator for Petitioner rather than allowing him to retain his own with funds previously allocated by the court.

Doc. 1, at 6–15.[3] The Warden filed a return, Doc. 7, Hackett filed a traverse, Doc. 10, and the Warden filed reply to the traverse, Doc. 11.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or the 1996 Act), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to

---

[3]     Given their length, I have not reproduced Hackett's supporting facts.

exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). To exhaust his remedies, a state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Williams*, 460 F.3d at 806 (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). "'[G]eneral allegations of the denial of rights to

13

a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

> *Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

14

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) ("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted.") (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)). While the exhaustion requirement is technically satisfied in this circumstance because state remedies are no longer available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or show that a "fundamental miscarriage of justice" will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218,

15

231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that the state court's adjudication "was contrary to," or "involved an unreasonable application of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law'" refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting 28 U.S.C. § 2254(d)(1) and *Woodall*, 572 U.S. at 419). A state court

16

is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *see Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

17

## Discussion

*1. Ground one, relating to the sufficiency of the evidence to support Hackett's rape conviction, fails on the merits.*

In his first ground for relief, Hackett asserts that the evidence was insufficient to convict him of rape. Doc. 1, at 6. Because Hackett presented this issue to the Ohio court of appeals and the Ohio Supreme Court, *see* Doc. 7-1, at 214–16, 300–05, we may proceed to the merits.[4]

When reviewing a claim that a petitioner's conviction is not supported by sufficient evidence, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson*, 443 U.S. at 319). In applying the standard, the court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Id.*; *see*

---

[4]     For reasons that are unclear, the Warden asserts that Hackett raises his first three grounds in his habeas petition as a claims under the Sixth Amendment and, because he did not preserve these ground under the Sixth Amendment, he failed to fairly present them before Ohio's courts. Doc. 7, at 30–33. But Hackett doesn't invoke the Sixth Amendment as to these claims. *See* Doc. 1, at 6–9.

*also Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the Court defers "to the trier-of-fact's verdict, as contemplated by *Jackson*." *Davis*, 658 F.3d at 531. And second, the Court defers under the 1996 Act to the state courts' "consideration of the trier-of-fact's verdict." *Id*. So even if this Court would conclude in the first instance that a rational trier of fact could not have found Hackett guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This doubly deferential "standard erects 'a nearly insurmountable hurdle' for petitioners who … seek habeas relief on sufficiency-of-the-evidence grounds." *Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015) (quoting Davis, 658 F.3d at 534)).

The Ohio court of appeals, which was the last court to offer a reasoned opinion about this issue, rejected Hackett's arguments. As to Hackett's rape conviction, the Ohio court of appeals held:

> {¶63} Appellant raises both a sufficiency of the evidence argument and manifest weight of the evidence argument in regard to his rape conviction.
>
> ….
>
> 1. Sufficiency of the Evidence
>
> {¶64} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In determining whether the evidence is legally sufficient to support a conviction, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, 919 N.E.2d 190, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001). In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence).

{¶65} Appellant was convicted of first degree felony rape in violation of R.C. 2907.02(A)(2). That section states no person "shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).

{¶66} Appellant contends the trial testimony fails to establish Appellant and the victim had sex, let alone that Appellant raped her. He contends the state's evidence supporting the rape was that the victim's body was found naked, except for her brassiere, and the vaginal swab from the sexual assault kit positively identified seminal fluid. Appellant asserts that evidence did not specifically link him to the seminal fluid; the expert only indicated he could not be excluded as a possible contributor.

{¶67} The state counters arguing there was sufficient evidence of rape for the charge to be submitted to the jury. It relies on the fact that the victim was naked except for her brassiere, she was stabbed 81 times, a letter from the victim to her boyfriend in jail stated Appellant hated her and that she would not have sex with anyone else but the boyfriend, and expert testimony established Appellant and all his male paternal relatives could not be excluded as possible contributors to the seminal fluid. The state cites to *State v. Adams* for the proposition that testimony that the victim would have not engaged in sex with the defendant and DNA evidence matching the defendant to the semen sample was sufficient evidence to establish rape in violation of R.C. 2907.02. 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 276.

{¶68} Evidence admitted at trial revealed Appellant and the victim were together on October 13, 2013. The GPS coordinates from Appellant's phone indicated Appellant was in the area where the victim's body was found at the same time the victim was there. 5/30/17 Trial Tr. 472-477. This time span was from approximately 8:00 p.m. to 9:00 p.m. on October 13, 2013. 5/30/17 Trial Tr. 472-477. Text

messages also showed Appellant and the victim had planned to meet on the night of October 13, 2013 to do drugs and they were going to use a vehicle with a "curtain." Tr. 482; 686. A toxicology analysis was performed during the autopsy; the victim had ecstasy, cocaine, and heroin in her system. 5/30/17 Trial Tr. 635-637. Surveillance video showed a dark colored van arrived to the area around 8:00 p.m. on October 13, 2013 and left around 9:00 p.m. on October 13, 2013. 5/30/17 Trial Tr. 554-555, 659; State's Exhibit 48. Blood on the steering wheel of Appellant's dark conversion van with a curtain was consistent with the victim's DNA and the expert who performed the testing stated that same profile would be found in 1 in 9,700,000,000 unrelated individuals. 5/30/17 Trial Tr. 516; State's Exhibit 150.

{¶69} Weaver gave the police jeans she thought Appellant was wearing on October 13, 2013. Those jeans had blood stains on them and were tested for Appellant and the victim's DNA. The test results determined the victim was a major contributor to the DNA and Appellant was a minor contributor. 5/30/17 Trial Tr. 512; State's Exhibit 150. As to the victim, the expert would have had to test more than one trillion unrelated individuals before she would find one that would be consistent with the major profile on the jeans. 5/30/17 Trial Tr. 514; State's Exhibit 150. As to Appellant, the expert testified that she would have to test 684,900 individuals to find one individual that was consistent with the minor DNA profile. 5/30/17 Trial Tr. 514. A swabbing of the waistband of the jeans was also tested; it contained a mixture of DNA profiles, and it was found Appellant and the victim were both contributors to the DNA found on the waistband. 5/30/17 Trial Tr. 514; State's Exhibit 150.

{¶70} The testimony and evidence does indicate the victim was found naked except for her brassiere, which was positioned in a way that partially exposed one breast. 5/30/17 Trial Tr. 535. The coroner collected samples from the victim for a sexual assault kit. Y-STR testing was performed on the

22

swabs taken from the sexual assault kit. Y-STR testing focuses on the male DNA, the Y chromosome. 5/30/17 Trial Tr. 583. The expert stated Y-STR testing is valuable in situations where there is a high quantity of female DNA and it masks the male DNA. 5/30/17 Trial Tr. 584. This happens in the vaginal cavity. 5/30/17 Trial Tr. 584. The testing of the swab taken from the vagina of the victim indicated Appellant and all of his male paternal relatives could not be excluded as a possible contributor. 5/30/17 Trial Tr. 590-591; State's Exhibit 151. The expert explained why in Y-STR testing the term used is "cannot be excluded" as opposed to a regular DNA test where it is an indication of the number of the population. 5/30/17 Trial Tr. 595. The expert further testified:

> For the vaginal swabs, the partial profile, it was seen 0 times in 6,190 individuals of the African American population and 0 times in 7,348 individuals of the Caucasian population. Now, saying that it was seen 0 times does make it a unique profile and it doesn't mean that it came from that individual. So we do a further statistical calculation to come up with a frequency of that profile, like how many times is it possible to see that particular profile.

> And that number, for the African-American population, the frequency of that profile is 1 in 2,070 individuals, but that means that 99.9 percent of the world's population is excluded and could have contributed to that profile. And for the Caucasian population, the number is 1 in 2,457 individuals, and again, 99.99 percent of the Caucasian population is also excluded as having donated that profile.

5/30/17 Trial Tr. 595-596.

{¶71} Despite Appellant's insistence that the state did not present evidence the victim and Appellant had sex, this evidence, when viewed in the light most favorable to the state, indicates Appellant and the

victim did have vaginal intercourse. The mere fact that the expert testified Appellant could not be excluded as a contributor to the seminal fluid, does not mean it was not his seminal fluid. The statistics as explained by the expert indicate there was a high probability he was a contributor of the seminal fluid. The evidence also shows they were together on October 13, 2013. Therefore, when viewed in the light most favorable to the prosecution, there was evidence of sexual conduct between Appellant and the victim on October 13, 2013. R.C. 2907.01(A)(Sexual conduct includes vaginal intercourse.).

{¶72} However, in order to be rape under R.C. 2907.02(A)(2) there must be force or threat of force. "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The state presented evidence through text messages between the victim and Appellant that she was behind on paying Appellant for drugs. Tr. 679-686; State's Exhibit 159. The victim also told her boyfriend in a letter that she would only have sex with him. State's Exhibit 52. In that letter she also stated things were getting difficult at Appellant and Weaver's house, and Appellant hated her. State's Exhibit 52. Weaver testified Appellant was her boyfriend and she was not aware of any sexual relationship between Appellant and the victim. 5/30/17 Trial Tr. 324. Appellant's knife was identified as being consistent with the murder weapon and it was found close to where the victim's body was found. 5/30/17 Trial Tr. 266-267, 314. When this evidence is viewed in the light most favorable to the prosecution a reasonable person might conclude that Appellant forced the victim to have sex with him to pay off her drug debt and used the knife as the threat of force.

{¶73} Consequently, the state produced sufficient evidence of rape; the state met its burden of production.

24

2. Manifest Weight of the Evidence

{¶74} In determining whether a verdict is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. A reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other'." *Id.* at 387.

{¶75} An appellate court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999), citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583, (1982) (weight of evidence and witness credibility are for trier of fact). Thus, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, this court will not choose which one is more credible. *State v. Houston*, 7th Dist. No. 17 NO 0455, 2018-Ohio-2788, ¶ 19.

{¶76} As explained above, the state produced evidence Appellant and the victim were where her body was found from about 8:00 p.m. to 9:00 p.m. on October 13, 2013. The GPS coordinates from the

phones and surveillance video did not correspond to where Weaver testified Appellant was or where Appellant told the police he was. Appellant claimed to be in Salem, Ohio during that time, but no phone records indicated his phone was in Salem. 5/30/17 Trial Tr. 483. Weaver testified Appellant was with her for a period of time driving back and forth to church and then went to get her a coffee. 5/30/17 Trial Tr. 308-310. Furthermore, there was also evidence, as discussed above, which if believed by the jury, could lead to a reasonable person to conclude Appellant raped the victim.

{¶77} However, text messages to and from Appellant and the victim could lead a jury to believe another version of the events. The text messages do indicate the victim did owe Appellant for drugs and that she would steal things to pay for drugs. While the letter to her boyfriend indicates she would not have sex with anyone else but him, some text messages to and from Appellant could suggest otherwise. One of her text messages to Appellant states, "Just like its ok for me to steal and fuck for drugs and money cuz Im not a good person like ruth." State's Exhibit 159. Another text message implies she was giving oral sex for money to pay her drug debt. State's Exhibit 159. Thus, given some of the text messages it could be determined the sex was consensual, there was no force or threat of force, in exchange for paying off a drug debt.

{¶78} However, in order to believe the sex was consensual one would have to reconcile the fact that the victim was killed with a knife identified as the Appellant's. The victim's DNA was on that knife and the knife was found near her body. Also the victim was stabbed 81 times and left on the access road naked, except for her brassiere. She had defensive wounds on her hands. The victim's blood was found on Appellant's pants and in his van on the steering wheel. These factors do not indicate that the sexual encounter was consensual. Rather, it was obtained through force or threat of force.

26

{¶79} Therefore, given the evidence, we cannot conclude the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

3.  Conclusion

{¶80} The sufficiency and manifest weight of the evidence arguments are meritless. This assignment of error lacks merit.

*Hackett*, 2019 WL 1402894, at *11–14.

Relevant to Hackett's conviction, Ohio's rape statute provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Ohio Rev. Code § 2907.02(A)(2); *see* Doc. 7-2, at 905–06 (jury instructions). Hackett conceded during trial, and concedes now, that he had sexual intercourse with his victim.[5] Doc. 7-2, at 805; *see* Doc. 1, at 6; Doc. 10, at 6. So the issue before the Court is whether the evidence was sufficient to show that Hackett compelled sexual intercourse "by force or threats of force."

Hackett's argument in support of his first ground barely leaves the starting gate. He presents his argument as if this Court will engage in an appellate review function similar to the Ohio court of appeals. Hackett, thus, fails to take account of the doubly deferential manner in which this Court

---

[5]    Even absent this concession, the court of appeals explained that expert testimony established that "there was a high probability" that Hackett "was a contributor of the seminal fluid" found after testing was performed on vaginal swab taken from the victim. *Hackett*, 2019 WL 1402894, at *13. Hackett has not presented clear and convincing evidence sufficient to rebut this determination. *See Johnson*, 525 F.3d at 474.

27

reviews the Ohio court of appeals' decision. Under this standard, it doesn't matter whether this Court might conclude in the first instance that a rational trier of fact could not have found Hackett guilty beyond a reasonable doubt. Rather, the Court will "defer to the [court of appeals'] sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205.

As noted, "[c]ircumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson*, 200 F.3d at 992. Here, the circumstances cited by the Ohio court of appeals support Hackett's conviction.

As the Ohio court of appeals noted, GPS data from Hackett's phone showed that he was in the area where the victim's body was found, when she was there between 8:00 p.m. and 9:00 p.m. on October 13, 2013. And Hackett and the victim had texted about meeting during that evening to use drugs in a vehicle with a curtain. Surveillance footage showed a dark van in the area during that time. Hackett had a dark conversion van with a curtain. Blood found on the van's steering wheel matched the victim's DNA. So there was solid evidence that Hackett and the victim were together in his van on the evening when she was murdered.

As to force, the victim told her boyfriend in a letter that she would not have sex with anyone but him. And expert testimony established that "there was a high probability" that Hackett "was a contributor of the seminal fluid" found after testing was performed on vaginal swab taken from the victim. In

Ohio, this sort of evidence is enough to establish a rape. *See State v. Adams*, 45 N.E.3d 127, 173 (Ohio 2015). There was more, however.

In a letter, the victim expressed that "things were getting difficult at" Hackett's and house and that he "hated her." Further, the victim, who was found naked except for her brassiere, was stabbed 81 times. And her blood was found in Hackett's van.

In the face of this evidence, Hackett merely offers his opinion of the evidence and an alternative view of what the evidence shows. *See* Doc. 10 at 4–12. But this doesn't show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. And it ignores the deference the Court owes to the trier-of-fact's determination. *Brown*, 567 F.3d at 205. Moreover, Hackett has not shown that the Ohio court of appeals' sufficiency determination was "unreasonable." *Id*. So this Court must defer to it. *Id.*; *see also White*, 602 F.3d at 710. The Court should thus reject Hackett's first ground.

2. *Hackett procedurally defaulted his second ground, relating to his kidnapping convictions*

As to Hackett's kidnapping convictions, the Ohio court appeals held:

> {¶81} The standards for sufficiency of the evidence and manifest weight of the evidence are set forth above and apply to this assignment of error. As with the previous assignment of error, Appellant simultaneously asserts the kidnapping convictions are based on insufficient evidence and are against the manifest weight of the evidence.

29

{¶82} Appellant was indicted and convicted of two counts of kidnapping, one in violation of R.C. 2905.01(A)(2) and R.C. 2905.01(A)(4). Those sections of kidnapping are defined as:

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> * * *
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;

R.C. 2905.01(A)(2)(4).

{¶83} In asserting the convictions for kidnapping are based on insufficient evidence and against the manifest weight of the evidence, Appellant relies on the coroner's report which indicated the victim was stabbed 81 times, some of which were inflicted after death. The doctor could not testify in which order the wounds were inflicted and indicated she could have died in as little as 60 seconds from when the attack began or as long as 2 minutes. Appellant asserts the doctor's testimony is all that is known of the attack. He indicates this testimony does not support the conclusion that the victim's liberty was restrained during the attack. He argues there is no way to tell how long the attack was and if it began and ended in the same place. Therefore, he contends the convictions for kidnapping must be reversed. Appellant then asserts since the rape conviction must also be reversed, the aggravated murder conviction must be modified to murder since the

aggravated murder charge was premised on the underlying charges of rape and/or kidnapping.

1. Sufficiency of the Evidence

{¶84} Appellant's arguments focus on restraining liberty. To restrain a person of their liberty means to limit or restrain their freedom of movement. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 18; *State v. Wingfield*, 8th Dist. No. 69229, 1996 WL 100847 (Mar. 7, 1996). "The restraint need not be for any specific duration or in any specific manner." *Taylor*; *Wingfield*. Momentary restraint is sufficient to qualify as restraint; the duration of the restraint does not have to be prolonged. *State v. Alghamdi*, 9th Dist. No. 28837, 2018-Ohio-3158, ¶ 5; *State v. Young*, 10th Dist. No. 12AP-314, 2013-Ohio-1247, ¶ 19.

{¶85} A knife was used during the commission of the offenses; the victim was stabbed 81 times. The doctor testified:

> [T]here's no wound that causes immediate incapacitation. The most serious wound is the one of the left neck that goes in that carotid artery. If that's the first of the 81 stab wounds, she's going to be incapacitated in a matter of seconds, like 60 seconds' worth of seconds. If that's the last one, then it's less than 60 seconds afterwards because she's already had damage to her lungs and such. So it would be within two minutes of the first wound when she would become incapacitated.

5/30/17 Trial Tr. 639.

{¶86} Although the evidence could not establish the order in which the victim was stabbed or how long the attack lasted, that testimony established she was incapacitated within 60 seconds to 2 minutes. The doctor's testimony also established the victim had defensive wounds on her hands and bruising on her left shin and lower leg. 5/30/17 Trial Tr. 626, 630.

31

The duration leading to incapacitation in combination with evidence of defensive wounds and the number of times she was stabbed, when viewed in the light most favorable to the state, was sufficient to establish the victim's liberty was restrained, even if it was only restrained momentarily.

{¶87} The state cites this court to the Ninth Appellate District *Wong* case for the proposition that stabbing someone numerous times could lead a reasonable person to believe the victim's liberty was restrained. *State v. Wong*, 9th Dist. No. 27486, 2016-Ohio-96, ¶ 29. In that case, the stabbing lasted a number of minutes and occurred throughout the house. *Id.* The victim was stabbed 103 times and the appellate court described the attack as "long and brutal" and the victim suffered from an extensive amount of defensive wounds. *Id.* at ¶ 28. Although the victim tried to move away from the aggressor to different rooms in the house that did not mean the victim's liberty was not restrained; a jury could reasonably conclude stabbing a person 103 times was restraining her liberty. *Id.* at ¶ 29.

{¶88} That reasoning is sound and applicable to the situation at hand. Consequently, there was sufficient evidence of restraint.

{¶89} The other elements are the kidnapping occurring during the commission of another felony and/or the victim's liberty was restrained so Appellant could engage in sexual activity with the victim without her consent. The resolution of the third assignment of error was that there was sufficient evidence of rape. There was also evidence Appellant murdered the victim. His knife was found in close proximity to the victim's body. Cell phone GPS placed the victim and Appellant's phone at the location where the victim's body was found from approximately 8:00 p.m. to 9:00 p.m. on October 13, 2013, the night the victim was killed. Records of text messages between the victim and Appellant indicated the two were meeting that night to use

drugs, and the text messages also indicated Appellant was the victim's drug dealer and she was behind in paying him. This evidence was sufficient to establish the remaining elements of kidnapping.

2. Manifest Weight of the Evidence

{¶90} Appellant's argument that the kidnapping convictions are against the manifest weight of the evidence is the same argument as the sufficiency argument.

{¶91} The jury was in the best position to judge and weigh the evidence presented by the state to establish the elements of kidnapping. Given the evidence presented at trial, a reasonable inference could be drawn that the victim's liberty was restrained. The logical conclusion is the use of a knife and stabbing a person multiple times is a restraint on the victim's liberty. This court cannot conclude the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

3. Conclusion

{¶92} For the above stated reasons, this assignment of error lacks merit. There was sufficient evidence establishing the elements of kidnapping. Likewise, the jury's determination that Appellant committed the crime of kidnapping was not against the manifest weight of the evidence.

*Hackett*, 2019 WL 1402894, at *15–17.

As noted, Hackett's indictment charged him in count three with kidnapping in violation of Ohio Revised Code § 2905.01(A)(2), which relates to restraining another person's liberty for the purpose of "facilitate[ing] the

commission of any felony or flight thereafter."[6] Doc. 7-1, at 6–7. And in count four, the indictment charged Hackett with kidnapping in violation of Ohio Revised Code § 2905.01(A)(4), which relates to restraining another person's liberty for the purpose of "engag[ing] in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." *Id*. at 7.

In his appeal before the Ohio court of appeals, Hackett focused on whether evidence existed to show that his victim's "liberty was restrained during the attack." Doc. 7-1, at 217. In his appeal to the Ohio Supreme Court, however, Hackett first argued that because—he claimed—there was insufficient evidence to support his rape conviction, his kidnapping conviction under Ohio Revised Code § 2905.01(A)(4) was likewise not supported by sufficient evidence. *Id*. at 305–06. Next, he said that although his rape conviction could support a kidnapping conviction under Ohio Revised Code § 2905.01(A)(2)—"facilitate[ing] the commission of any felony"—if his rape conviction were overturned, his conviction under section 2905.01(A)(2) would depend on his murder conviction. *Id*. at 306. But, he argued, "there is no statutory or authoritative basis" to allow his murder offense to be the basis for his kidnapping conviction. *Id*. According to Hackett, because kidnapping was the underlying aggravating element for his murder conviction, the

---

[6]     The indictment refers to section 2905.01(A)(2)*(C)*. Doc. 7-1, at 6. Because there is no subparagraph (C), it is apparent that the (C) should have preceded by a comma; subsection (C) sets out the penalties for violating subsection (A).

circumstance gave rise to a circular result. *Id*. As a result, Hackett argued that his kidnapping convictions necessarily depended on his rape conviction. *Id*.

In his current habeas petition, Hackett doesn't explain the basis for his argument. *See* Doc. 1, at 8. In his traverse, however, he presents essentially the same argument that he presented to Ohio's Supreme Court. *Compare* Doc. 10, at 12–14, *with* Doc. 7-1, at 305–07.

Hackett has procedurally defaulted his second ground because he failed to fairly present this argument at each level in his state court appeals process. With respect to his kidnapping convictions, Hackett only argued to the Ohio court of appeals that there was insufficient evidence that his victim's "liberty was restrained during the attack." Doc. 7-1, at 217. Hackett failed to raise this argument to the Ohio Supreme Court, however.

By failing to present this issue to the Ohio Supreme Court, Hackett failed the fair presentment requirement. *See O'Sullivan*, 526 U.S. at 845–48; *Caver*, 349 F.3d at 345. And Ohio's res judicata rule would prevent him from raising a sufficiency challenge now in a petition for post-conviction relief. *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000) ("Ohio has a rule that claims must be raised on direct appeal if possible; otherwise, res judicata bars their litigation in subsequent state proceedings."); *see State v. Szefcyk*, 671 N.E.2d 233, 235 (Ohio 1996) (reaffirming the rule from *State v. Perry*, 226 N.E.2d 104 (1967)); *see also Romero v. Warden, Chillicothe Corr. Inst.*, No. 17-3369, 2017 WL 8793325, at *2 (6th Cir. Dec. 13, 2017) (order).

35

Hackett could avoid this result by showing cause and prejudice, but he doesn't argue that he could show cause or prejudice. There is thus no need to discuss cause and prejudice. *See Awkal v. Mitchell*, 613 F.3d 629, 646 (6th Cir. 2010). Hackett also doesn't claim that a "fundamental miscarriage of justice" will result if his claims are not considered. *Coleman*, 501 U.S. at 750. So this aspect of Hackett's second ground is procedurally defaulted. *Romero*, 2017 WL 8793325, at *2.

Next, consider the separate arguments that Hackett raised before Ohio's Supreme Court, but which he failed to present to the Ohio court of appeals. "As a general rule, the Ohio Supreme Court will not consider a claim not raised in the Ohio Court of Appeals; thus, claims raised for the first time in the Ohio Supreme Court are defaulted." *Ogle v. Ohio Dep't of Rehab. & Corr., Adult Parole Auth.*, No. 17-3701, 2018 WL 3244017, at *3 (6th Cir. Feb. 27, 2018); *see Hruby v. Wilson*, 494 F. App'x 514, 517 (6th Cir. 2012). Because Hackett could have raised these arguments "on direct appeal, Ohio's res judicata doctrine would bar [him] from presenting [them] in a state post-conviction petition." *Ogle*, 2018 WL 3244017, at *3.

And Hackett doesn't argue that he could show cause or prejudice. So there is no need to discuss cause and prejudice. *See Awkal*, 613 F.3d at 646. Hackett also doesn't claim that a "fundamental miscarriage of justice" will result if his claims are not considered. *Coleman*, 501 U.S. at 750. Hackett's

second ground is thus procedurally defaulted. *Romero*, 2017 WL 8793325, at *2.

But even if it could be said that Hackett preserved a sufficiency challenge to his kidnapping conviction, the Ohio court of appeals only considered the aspect of the issue that Hackett raised—that there was insufficient evidence to show that his victim's "liberty was restrained during the attack." Doc. 7-1, at 217. As to this argument, the Ohio court of appeals said:

> Although the evidence could not establish the order in which the victim was stabbed or how long the attack lasted, that testimony established she was incapacitated within 60 seconds to 2 minutes. The doctor's testimony also established the victim had defensive wounds on her hands and bruising on her left shin and lower leg. 5/30/17 Trial Tr. 626, 630. The duration leading to incapacitation in combination with evidence of defensive wounds and the number of times she was stabbed, when viewed in the light most favorable to the state, was sufficient to establish the victim's liberty was restrained, even if it was only restrained momentarily.

*Hackett*, 2019 WL 1402894, at *16.

Hackett offers no basis to question this determination. Indeed, he ignores it. More importantly, he doesn't acknowledge the deference this Court owes to "to the trier-of-fact's verdict," or to the court of appeals' "consideration of the trier-of-fact's verdict." And he offers no basis to conclude that the Ohio court of appeals' sufficiency determination was "unreasonable." *Brown*, 567 F.3d at 205. The Court should thus reject this ground for relief.

37

    *3.  Hackett's third ground, relating to the sufficiency of the evidence supporting his murder conviction, is procedurally defaulted.*

"In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal." *Williams*, 460 F.3d at 806; *see Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 830 (6th Cir. 2019) (explaining that Ohio courts enforce res judicata). As a result, "if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised on direct appeal, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806; *see Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004).

    In his third ground, Hackett argues that there was insufficient evidence to support his aggravated murder conviction. Doc. 1, at 9–10. But he failed to raise this issue before the Ohio court of appeals or the Ohio Supreme Court. Given that it is now too late to raise this issue in a state post-conviction petition, *see Gerth*, 938 F.3d at 830, this claim is procedurally defaulted, *Williams*, 460 F.3d at 806.

    Except to say that his "[a]ppellate counsel failed to raise the issue," Hackett says nothing about cause and prejudice as to his third ground. *See* Doc. 1, at 10. It is true that ineffective assistance of appellate counsel can serve as cause to excuse a procedural default. But that will only be the case if the ineffective assistance of appellate counsel claim is not itself procedurally defaulted and the court finds that appellate counsel was constitutionally ineffective. *See Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000). And here,

although Hackett claimed in his Rule 26(B) application that his counsel was ineffective for not raising this issue on appeal, *see* Doc. 7-1, at 522–23, he failed to appeal the Ohio court of appeals' decision to the Ohio Supreme Court. So he has procedurally defaulted the ineffective assistance claim on which he relies to show cause. *See Williams*, 460 F.3d at 806; *English v. Banks*, No. 1:11-cv-675, 2012 WL 3070742, at *15 (S.D. Ohio July 30, 2012) ("Failure to present an issue to the state supreme court on discretionary review constitutes procedural default") (citing *O'Sullivan*, 526 U.S. at 848).

Further, Hackett says nothing about prejudice. The cause-and-prejudice test, however, is "'in the conjunctive.'" *Murray v. Carrier*, 477 U.S. 478, 494–96 (1986) (citation omitted). Failure to address both prongs of the test is thus "fatal" to a habeas petitioner's effort to meet the test. *Thacker v. Rees*, 841 F.2d 1127, 1988 WL 19179, at *6 n.4 (6th Cir. 1988) (unpublished); *see Hockenbury v. Sowders*, 718 F.2d 155, 160 (6th Cir. 1983) ("The 'cause' and 'prejudice' requirement ... is in the conjunctive. Not finding 'cause' in this case, we need not address the issue of prejudice."); *Jones v. Tibbals*, No. 5:13-cv-1171, 2014 WL 1806784, at *8 (N.D. Ohio May 7, 2014) ("Since the cause and prejudice standard is in the conjunctive, Petitioner's failure to show 'cause' ends the analysis."). Finally, Hackett doesn't claim that a "fundamental miscarriage of justice" will result if his third ground is not considered. *Coleman*, 501 U.S. at 750.

It is true that Hackett argued in his Rule 26(B) application that his appellate counsel was ineffective for failing to argue that the evidence was insufficient to support his murder conviction. *See* Doc. 7-1, at 522–23. But a Rule 26(B) application is a vehicle to raise ineffective assistance of appellate counsel; it doesn't function to preserve merits arguments. *See Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("a Rule 26(B) application 'based on ineffective assistance cannot function to preserve' the underlying substantive claim"). Moreover, as noted, after the Ohio court of appeals denied Hackett's application, *see Hackett*, 2019 WL 4413335, he failed to appeal that court's decision to the Ohio Supreme Court. The Court should thus reject this ground.

### 4. *Hackett's fourth ground fails on the merits*

In his fourth ground, Hackett argues that his right to counsel under the Sixth and Fourteenth Amendments was violated when the trial court failed to ensure that "his waiver of counsel was made knowingly, intelligently[,] and voluntarily." Doc. 1, at 11. The Ohio court of appeals rejected this argument:

> {¶24} Appellant argues the trial court was more interested in attempting to talk him out of representing himself then determining if the waiver was made knowingly, intelligently, and voluntarily. He contends the court never asked Appellant about his education or discussed the possible defenses or mitigation of charges. He also asserts he was not aware he could not have hybrid representation.
>
> {¶25} The state argues the record includes the transcript of the hearing where Appellant moved to proceed pro se and the transcript where he asked for full assistance of standby counsel and those transcripts along with the written waiver of

40

assistance of counsel demonstrates Appellant knowingly and voluntarily waived the right to counsel. The state does not address the specific arguments that Appellant was not advised about possible defenses or mitigation of charges, or asked about his education.

{¶26} The Sixth Amendment to the United States Constitution provides that criminal defendants shall have the right to the assistance of counsel for their defense. The Sixth Amendment's guarantee of counsel also includes the right of self-representation. *State v. Johnson*, 112 Ohio St.3d 210, 2006–Ohio–6404, ¶ 89, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

{¶27} To establish an effective waiver of the right to counsel, the trial court must make sufficient inquiry to determine whether the defendant fully understands and intelligently relinquishes that right. *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph two of the syllabus. Crim.R. 44 requires waiver of counsel to be made in open court and for a serious offense, such as the one before us, the waiver must be in writing. Crim.R. 44(C).

{¶28} The Ohio Supreme Court has mentioned:

> "To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in

mitigation thereof, and all other facts essential to a broad understanding of the whole matter."

*Gibson*, 45 Ohio St.2d at 377, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723, 68 S.Ct. 316, 92 L.Ed.2d 309 (1948).

{¶29} The Ohio Supreme Court once again reiterated the factors to consider for a valid waiver in 2004. *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 277, quoting *Gibson* quoting *Von Moltke.*

{¶30} Furthermore, in order for the defendant to competently and intelligently choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record will establish that " 'he knows what he is doing and his choice is made with eyes open.' " *Faretta* at 835, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). However, there is no single test to determine if a defendant has knowingly, intelligently, and voluntarily waived his right to counsel. *State v. Mootispaw*, 4th Dist. No. 09CA33, 2010–Ohio–4772, ¶ 21. Instead, appellate courts should independently examine the record, i.e., conduct a de novo review, to determine whether the totality of circumstances demonstrates a knowing, intelligent, and voluntary waiver of the right to counsel. *Id.*

{¶31} The waiver hearing transcript is 23 pages long. The trial court at length discussed the implications of self-representation. The trial court asked Appellant if he had an understanding of the rules of evidence and criminal procedure. 1/18/17 Counsel Waiver Tr. 9-10. Appellant indicated his familiarity with those rules was limited. 1/18/17 Counsel Waiver Tr. 10. The court explained Attorney DeFabio had years of experience and understanding of those rules. 1/18/17 Counsel Waiver Tr. 10-11. The court stated that if Appellant chose to represent himself he would be bound by those rules and due to

his limited understanding of the rules he might not be able to "proceed and present a defense that you wanted presented because you don't know how to present it." 1/18/17 Counsel Waiver Tr. 11. The court also explained that it could not tell Appellant how to ask questions if the state lodged an objection. 1/18/17 Counsel Waiver Tr. 11. The court then explained that if he represented himself, was convicted and appealed, he could not raise ineffective assistance of counsel on appeal. 1/18/17 Counsel Waiver Tr. 11-12.

{¶32} The trial court also explained the nature of the charges and the ranges of penalties. 1/18/17 Counsel Waiver Tr. 12-15. The trial court indicated that if it granted the request of self-representation, it would appoint Attorney DeFabio as standby counsel. 1/18/17 Counsel Waiver Tr. 16. The trial court discussed the Crim.R. 11 plea agreement that was offered by the state. The state offered to amend count one to murder, which would carry a sentence of 15 years to life; ask for the sentences for counts two through four to run concurrently with count one; and it would dismiss the repeat violent offender specifications attached to counts two, three, and four. 1/18/17 Counsel Waiver Tr. 17-18. Appellant indicated he had already rejected that offer and was still rejecting that offer. 1/18/17 Counsel Waiver Tr. 18-19.

{¶33} After all the advisements, Appellant still expressed a desire to proceed pro se. 1/18/17 Counsel Waiver Tr. 15, 19. The trial court granted Appellant's request, however, it cautioned:

> All right. I cannot advise you strongly enough that I would discourage any individual from representing themselves, especially when that person acknowledges that they have a limited familiarity with the Ohio Rules of Evidence and a limited familiarity with the Ohio Rules of Criminal Procedure. I think you are asking for disaster. And again, I'm not getting to the issue of the timeliness of this motion yet, but

I'm trying to go through this discussion with you to attempt to convince you that you are far better off with an attorney who has experience trying cases like this than if you were to proceed on your own. So I'm going to turn it over to you. What are your thoughts?

* * *

Again, I am strongly cautioning you that I think you are making a mistake proceeding pro se, but it's your right. If you start this trial, whether you try to give opening statements, when you try to question witnesses, if during the trial you recognize that you're in over your heard and want Attorney DeFabio to jump in at that point in time, I would allow that, but he may be unable to repair any damage that you may have done acting as your own attorney without knowing the rules of evidence or the rules of criminal procedure. Do you understand?

1/18/17 Counsel Waiver Tr. 15, 16-17.

{¶34} In addition to the above colloquy, a written waiver was executed. 4/13/17 Waiver of Counsel. It listed the offenses and punishments. 4/13/17 Waiver of Counsel. Also included were advisements on the perils of representing oneself:

I understand that the services of a lawyer can be of great value in determining whether the charges against me are sufficient as a matter of law, whether the procedures used in investigating the charges and obtaining evidence against me, including any statements I may have made, were lawful, whether an act I may have committed actually amounts to the offense of which I am charged, whether I have any other valid defense to the charges, and if I am found guilty, whether I should be placed on community control, be required to pay a fine, or be sentenced to term of imprisonment. I understand that if I am found guilty of the offense charged the court may sentence me to a

44

term of imprisonment even though I have given up my right to a lawyer. I understand that if I am convicted I will have a right to appeal my case.

I understand that if I choose to represent myself the court will hold me to the same rules of evidence and procedure that a lawyer must follow. I understand that my lack of knowledge of these rules will not prevent the court from enforcing them. I understand that if I am convicted I will have a right to appeal my case, but my lack of knowledge of legal procedure or evidentiary rules may result in waiving review of certain issues on appeal.

4/13/17 Waiver of Counsel.

{¶35} The oral and written advisements clearly informed Appellant of the nature of the charges and the punishments if convicted of those offenses. Appellant was also clearly advised of the dangers and disadvantages of self-representation so that he could make a knowing and intelligent determination of whether to waive counsel and proceed pro se. We disagree with Appellant's characterization that the trial court's advisement was an attempt to talk him out of self-representation. The advisement was a statement about the pitfalls of self-representation.

{¶36} Admittedly, as Appellant points out, there was not a discussion of the possible defenses to the charges. However, given the totality of the circumstances and the advisement given, this court concludes the lack of this discussion alone is not enough to find that Appellant did not knowingly, intelligently, and voluntarily waive his right to counsel. The Ninth Appellate District has stated, "It is not necessary that the court 'undertake pseudo-legal representation of a defendant by specifically advising him of possible viable defenses or mitigating circumstances * * *.'" *State v. Yeager*, 2018-Ohio-574, 106 N.E.3d 274, ¶ 6 (9th Dist.), citing *State v. Bloodworth*, 9th Dist. No. 26346,

45

2013-Ohio-248, ¶ 12, quoting *Ragle*, 2005-Ohio-590 at ¶ 12. "[A] broader discussion of defenses and mitigating circumstances as applicable to the pending charges is sufficient." *State v. Trikilis*, 9th Dist. Nos. 04CA0096–M, 04CA0097–M, 2005-Ohio-4266, ¶ 13. "A court may also consider various other factors, including the defendant's age, education, and legal experience." Id.

{¶37} In *Yeager*, the fact that Yeager had counsel for five months prior to representing himself, he actively participated in the proceedings, and had previously represented himself pro se contributed to the determination that the waiver was intelligent, voluntary, and knowing even though the trial court did not specifically advise on defenses. *Yeager*, 2018-Ohio-574 at ¶ 8, 12.

{¶38} Similarly, the Third Appellate District has held a waiver is knowing, intelligent, and voluntary even though the trial court did not explicitly state that there may be "possible defenses to the charges and circumstances in mitigation thereof." *State v. Logan*, 2017-Ohio-8932, 101 N.E.3d 572, ¶ 40 (3d Dist.). The record in *Logan* reflected Logan did "a lot of work on his own" on the case, developed "a lot of theories," and drafted "expansive notes on questions he wanted to ask." *Id*. Logan also asked intelligent questions of the trial court regarding representing himself during the ex parte hearing and Logan had previously represented himself in a criminal case. *Id*.

{¶39} When appellate courts have found an advisement to be invalid and the waiver unknowing, unintelligent or involuntary, they have done so when the offender was not advised about multiple things. For instance, the Eighth Appellate District determined a waiver invalid when the trial court failed to advise the offender of the dangers of self-representation, did not review the elements of the charges or any defenses to the charges, and did not advise the offender that if he elected to proceed pro se, he would be held to the same standards as an

46

attorney. *City of Cleveland v. Daniels*, 8th Dist. No. 106136, 2018-Ohio-4773, ¶ 14. *See also Cleveland v. Anderson*, 8th Dist. No. 97787, 2013-Ohio-165, ¶ 10 (Where this court noted that the trial court did not engage in any colloquy with the defendant "advising him of the nature of the charge, the statutory offense included within it, the range of allowable punishment, possible defenses to the charge and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the matter").

{¶40} Although there is no indication in the record Appellant had previously proceeded pro se in a criminal case, this case is more akin to *Logan* and *Yeager* than it is to *Daniels*. Appellant was on parole for aggravated murder and aggravated robbery when the crimes were committed; Appellant had been convicted by a jury in 1979. Thus, Appellant had some understanding of the criminal justice system and the jury process. Appellant had counsel for over three years before he moved to represent himself; the motion was filed on the day trial was to begin. Furthermore, the pro se motions leading up to the trial were researched and well written. The trial court noted this during the hearings on Appellant's Motion for Full Assistance of Standby Counsel. 3/31/17 Tr. 5; 4/13/17 Tr. 2. During these hearings, the trial court sustained Appellant's Brady motion. 4/13/17 Tr. 5. Therefore, given that the trial court made all the other advisements set forth by the Ohio Supreme Court in *Martin* and *Gibson*, the failure to advise on defenses alone is not sufficient, given the facts in this case, to find the waiver invalid.

{¶41} Appellant also asserts the trial court did not ask him about his education. There is no specific rule requiring the trial court to inquire about the offender's education. The competence a defendant must possess in order to waive his right to counsel and represent himself "is the competence to waive the right, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399, 113 S.Ct. 2680

47

(1993). A "defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel," and his "ability to represent himself has no bearing upon his competence to choose self-representation." Id. at 400, quoting *Faretta*, 422 U.S. at 836. Organized educational achievement does not always have a bearing on the person's ability to intelligently waive counsel. A trial court can determine the ability to waive counsel through the advisements, which is why the advisements are required. *Gibson*, 45 Ohio St.2d at 377, quoting *Von Moltke*, 332 U.S. at 723. Regardless, as explained above, the trial court did ask about Appellant's understanding of the criminal procedures and evidentiary rules. The trial court was also aware that Appellant had committed a previous murder and was on parole when the crimes were committed. This shows a basic understanding of the criminal justice system.

{¶42} Appellant also contends the waiver was not intelligently made because he was not aware that he could not have hybrid representation. This argument is unfounded. In Appellant's pro se Motion for Full Assistance of Standby Counsel, he acknowledged he was not entitled to hybrid counsel or to act as co-counsel. 3/31/17 Motion. This motion is lengthy and cited to multiple cases concerning standby counsel and hybrid representation. At the hearing on this motion, Appellant specifically told the court he was not asking for hybrid representation. 3/31/17 Tr. 5. The trial court took the matter under advisement and a second hearing was held where the trial court explained it was overruling the motion. 4/13/17 Tr. 2-4. At this hearing, the trial court explained Appellant was not entitled to hybrid representation. 4/13/17 Tr. 2-4. The hearings and the motion indicate Appellant was aware that he could not have hybrid representation if he proceeded pro se.

{¶43} Consequently, considering the entire advisement and all the circumstances, the failure to advise Appellant of the possible defenses did not

48

>render the waiver unintelligent, unknowing, and/or
>involuntary. No one factor is dispositive in
>determining whether the waiver is valid. *Trikilis*,
>2005-Ohio-4266 at ¶ 13. This court concludes the
>record indicates Appellant knowingly, intelligently,
>and voluntarily waived his right to counsel.

*Hackett*, 2019 WL 1402894, at *3–7.

Hackett's argument has two components. First, he complains that the

trial court never asked about his education and never discussed defenses or

mitigation. Doc. 1, at 11. Second, he claims that until his trial started, he was

"left with the understanding that" his stand-by counsel could act as hybrid

counsel. *Id*.; *see* Doc. 10, at 18. These arguments fail because Hackett has

neither shown that the court of appeals decision "was contrary to," or "involved

an unreasonable application of clearly established" Supreme Court precedent

nor that its adjudication "resulted in a decision that was based on an

unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1), (2); *see Fields*,

86 F.4th at 231–32.

Take the first component of Hackett's argument, that the trial court

never asked about his education and never discussed defenses or mitigation.

Hackett notably does not challenge the Ohio court of appeals' factual

determinations about the lengths to which the trial court went to ensure that

Hackett's waiver as knowing and intelligible. So this Court is bound by the

Ohio court of appeals factual determinations. 28 U.S.C. § 2254(e)(1); *Johnson*,

525 F.3d at 474.

49

Moreover, it is Hackett's burden to identify Supreme Court precedent that stands for the proposition that, as a constitutional matter, Hackett's waiver was unknowing and not intelligently made because the trial court failed to (1) ask about Hackett's level of education, and (2) discuss possible defenses or mitigation. *See Fields*, 86 F.4th at 231; *Bergman v. Howard*, 54 F.4th 950, 957 (6th Cir. 2022). To be sure, Hackett relies on *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court's seminal case regarding a defendant's waiver of his right to counsel. But *Faretta* doesn't mandate that courts take either of these actions. Rather it provides that for a defendant to "competently and intelligently … choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 422 U.S. at 835.

Indeed, the Supreme Court has never "prescribed" a specific "formula or script to be read to a defendant who states that he elects to proceed without counsel." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Rather, "[t]he information a defendant must possess in order to make an intelligent election … will depend on a range of case-specific factors, including the defendant's education *or* sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* (emphasis added). Having eschewed a specific script, the Court has held that a defendant's "'waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the

right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it.'" *Id.* at 92 (quoting *United States v. Ruiz*, 536 U.S. 622, 629 (2002)). As a result, the fact that a defendant might not "full[y] and complete[ly] appreciate[e] … all of the consequences flowing from his waiver, … does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum." *Id.* (quoting *Patterson v. Illinois*, 487 U.S. 285, 294 (1988)).

Here, the trial court's lengthy discussion met "the constitutional minimum." The Ohio court of appeals' undisputed factual recitation establishes that during the lengthy waiver hearing, the trial court discussed (1) the implications of self-representation, (2) Hackett's limited understanding of the rules of evidence and criminal procedure, (3) stand-by counsel's "years of experience and understanding of those rules," (4) the fact that (a) Hackett "would be bound by those rules and" (b) "due to his limited understanding of the rules he might not be able to 'proceed and present a defense that you wanted presented because you don't know how to present it,'" (5) the fact that "it could not tell [Hackett] how to ask questions if the state" objected, and (6) the fact self-represented litigants cannot raise claims of ineffective assistance of counsel on appeal. *Hackett*, 2019 WL 1402894, at*4.

Hackett offers no Supreme Court decision that, in light of what the trial court covered, would have required the court to ask Hackett about his

education. Further, he doesn't explain what might have been gained by the inquiry. *See Tovar*, 541 U.S. at 92 ("it is the defendant's burden to prove that he did not competently and intelligently waive his right to the assistance of counsel").

Hackett also relies on *Von Moltke v. Gillies*, 332 U.S. 708 (1948), to support his argument that the trial court was required, as a constitutional matter, to discuss with Hackett "possible defenses to the charges and circumstances in mitigation." But *Von Moltke* arose "[i]n the context of a defendant representing herself when entering a guilty plea." *Akins v. Easterling*, 648 F.3d 380, 395 (6th Cir. 2011). So it does not alter the general rule in *Tovar* that the necessary inquiry depends on the circumstances.

As to the second component of Hackett's argument, he says that until his trial started, he was "left with the understanding that" his stand-by counsel could act as hybrid counsel. Doc. 1, at 11.; *see* Doc. 10, at 18. The record, however, belies this argument.

For starters, when the trial court first considered Hackett's request to proceed without counsel in January 2017, the trial court told him that stand-by counsel would be available to take over if Hackett changed his mind:

> If I grant your request to proceed pro se, I would appoint Attorney DeFabio as stand-by counsel so that if you at any point between now and the new trial date recognize that you're in over your head and want Attorney DeFabio to pick up, it will not cause a delay in the new trial date....

> If you start this trial, whether you try to give
> opening statements, whether you try to question
> witnesses, if during the trial you recognize that
> you're in over your head and want Attorney DeFabio
> to jump in at that point in time, I would allow that,
> but he may be unable to repair any damage that you
> may have done acting as your own attorney without
> knowing the rules of evidence or the rules of criminal
> procedure.

Doc. 7-2, at 38–39.

Hackett demonstrated his understanding of what having a stand-by counsel entailed. He filed a motion for "full assistance of standby counsel." Doc. 7-1, at 180. In it, he recognized that a stand-by counsel would be "relegated to the role of a silent observer." *Id*. at 181. He thus moved to allow his stand-by counsel to take a more active role. *Id*. at 180–89.

When it took the issue up again in March 2017, the trial court noted Hackett's pro se motion. It explained:

> And the second is a pro se motion to request full
> assistance of standby counsel. It's rather long. I'm
> not certain exactly what you're asking for in this. I'm
> looking at your conclusion and it says you are asking
> the court to allow Attorney Lou DeFabio to be
> actively and meaningfully involved in assisting you
> now and during the trial.

Doc. 7-2, at 52. Later when discussing whether stand-by counsel should be given access to discovery, the trial court said:

> That's absolutely fine with me. And you make a good
> point. *In the event Mr. Hackett determines at any*
> *point, now or prior to or during trial, that he is in*
> *over his head and would like you to step in as*
> *counsel*, you certainly have the right to have
> everything he does so that at least there can be

53

> hopefully some effective representation. So I'm fine
> with you providing – or obtaining that through the
> prosecutor's office by way of an attachment.

Doc. 7-2, at 54 (emphasis added).

And when it denied Hackett's motion, the trial court specifically told

Hackett that if he persisted in his plan to represent himself, stand-by counsel

would not be available to assist him:

> But in effect, you are indicating in your motion that
> obviously there are procedural and evidentiary
> obstacles that you face, including introducing
> evidence or objecting to testimony, and that
> Attorney DeFabio could assist you in that effort.
>
> We talked briefly when we were last here in open
> court about the concept of hybrid counsel. And the
> research that I've done leads me to conclude that
> *what you are asking for is hybrid representation.* It
> may be called something else, but you are asking for
> the assistance of Attorney DeFabio during your trial.
>
> ....
>
> I don't see any rule, *I don't see any case where the
> Ohio Supreme Court has indicated that hybrid
> counsel should or must be allowed.* In fact, the
> Supreme Court is clear. Hybrid representation
> differs from standby representation in that the
> defendant and counsel act as co-counsel, sharing
> responsibilities in preparing and conducting trial.
> And in *State v. Martin*, the Supreme Court of Ohio
> held that neither the United States Constitution, the
> Ohio Constitution, nor case law mandates hybrid
> representation. *You have the right either to appear
> pro se or to have counsel, but you have no
> corresponding right to act as co-counsel.* And in
> *Martin*, the Supreme Court reaffirmed that holding,
> and stated that you have the right to representation
> by counsel or to proceed on your own with the
> assistance of standby counsel; but those two rights

> are independent of each other, and may not be asserted simultaneously. *State v. Martin* is cited in 103 Ohio State 3d 385.
>
> So your pro se motion to request full assistance of standby counsel is overruled.
>
> ….
>
> And I again am going to encourage you to change your mind. I'm going to encourage you to utilize Attorney DeFabio, and to tell me that you think it's a good idea if you have him represent you and not act as standby counsel. Because again, if you don't, and we start trial, and you realize you're in over your head, and you ask Attorney DeFabio to come in at that point in time, that's not going to be a basis to continue the trial. He will have to come in, and it may be very difficult for him to pick up any damage that may have been caused because you were acting pro se.

Doc. 7-2, 59–61 (emphasis added).

Finally, at the start of Hackett's trial, the trial court again explained to Hackett that stand-by counsel could not assist him:

> THE DEFENDANT: May I ask, Your Honor, how do you define the responsibilities or the duties of standby counsel?
>
> THE COURT: If you decide now or during the trial that you are in over your head and ask me to have Attorney DeFabio step in, then he would come in as your attorney. It is nothing more and nothing less than that.
>
> THE DEFENDANT: So in essence, the only time he have a voice, then, is if I say I relinquish my defense as pro se.
>
> THE COURT: Not your defense. That you relinquish your choice to proceed pro se.

55

THE DEFENDANT: Okay. So my next question would be, if I -- we have a trial right now and I wish to present evidence and I don't know how, he can do nothing then, right?

THE COURT: Correct.

THE DEFENDANT: Is he allowed to speak now?

THE COURT: Is he allowed to speak?

THE DEFENDANT: Yes.

THE COURT: No. You filed a motion for, in effect, hybrid representation, and we've gone over this, too. What you are asking is to have his advice, his counsel, his wisdom, his experience, his education to assist you during the trial, and the Supreme Court of Ohio has clearly said that's improper, that it's hybrid representation. So his role as standby counsel is if you realize that you are not able, that you don't have the experience or the education to handle your defense, that you say, Judge Durkin, I need Attorney DeFabio now as my attorney.

THE DEFENDANT: Okay. So it's safe to assume, then, the case involving McGinnis, in the State of Ohio v. Alfred McGinnis was inadequate, because he was pro se and his attorney helped him in the trial and it was allowed. The higher supreme courts allowed that.

MR. DeFABIO: The U.S. Supreme Court.

THE DEFENDANT: The U.S. Supreme Court, I'm sorry.

THE COURT: The Ohio Supreme Court has determined that hybrid representation is not permitted.

> THE DEFENDANT: No, I'm not speaking of hybrid, Your Honor. In the McGinnis case, that wasn't hybrid. He was pro se.
>
> THE COURT: The Supreme Court has looked at that fact situation and has determined that it is, in fact, hybrid representation.
>
> THE DEFENDANT: I have nothing further, Your Honor.

Doc. 7-2, at 96–99.

The record thus shows both that the trial court explained that stand-by counsel would not be available to assist Hackett in his representation of himself and that Hackett understood this fact. Indeed, he filed his motion based on his understanding of this fact. So Hackett's fourth ground is meritless.

### 5. *Hackett fifth ground fails on the merits*

In his fifth ground, Hackett asserts that the trial court erred by "limit[ing] the role of … standby counsel" and directing counsel to "sit at the back of the courtroom rather than" at counsel's table, next to Hackett. Doc. 1, at 12.

The Ohio Supreme Court considered Hackett's argument and ruled that the Sixth Amendment does not "prevent a trial-court judge from limiting the role of standby counsel." *Hackett*, 172 N.E.3d at 78. It explained that because "[t]here is no Sixth Amendment right to any assistance from standby counsel[,] … limiting the role of standby counsel, in and of itself, cannot violate the Sixth Amendment." *Id*.

In reaching this conclusion, the Ohio Supreme Court recognized that in *Faretta* the Supreme Court held that a trial court "*may* 'appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.'" *Id.* at 78 (emphasis added) (quoting *Faretta*, 422 U.S. at 834 n.46). But, the Ohio Supreme Court explained, "the fact that a court is permitted to appoint standby counsel does not mean that a defendant has a constitutional right to standby counsel." *Id.* at 79.

The Ohio Supreme Court added that "it is well established that there is no constitutional right to standby counsel" and "there is no obligation under state or federal law to even inform a defendant who seeks to waive counsel about the possibility of appointing standby counsel." *Id.* It also noted that "federal courts that have addressed the issue have uniformly rejected the claim that there is a constitutional right to standby counsel." *Id.* (citing *United States v. Cohen*, 888 F.3d 667, 680 (4th Cir. 2018), *United States v. Mikolajczyk*, 137 F.3d 237, 246 (5th Cir. 1998), and *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998)). The Ohio Supreme Court then added:

> {¶ 15} Given that there is no Sixth Amendment right to standby counsel, it is hard to see how a court could violate the Sixth Amendment by appointing standby counsel but limiting counsel's role. Without a constitutional right to standby counsel at all, there is no constitutional entitlement that could ground a claim that standby counsel must provide a certain level of assistance.

{¶ 16} Indeed, as noted above, insofar as there is a constitutional worry related to the appointment of standby counsel, "the primary concern is that appointed counsel does too much, so as to abrogate the Faretta right to self-representation, not too little." Simpson, 458 F.3d at 597; see also United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.1997). That demonstrates another problem with Hackett's claim that there is a right to a certain level of involvement from standby counsel. Hackett would have us adopt a rule that would force a trial court to constantly navigate a Goldilocks problem—if standby counsel is allowed to do too much, then that risks a violation of the defendant's right to self-representation, and if standby counsel is allowed to do too little, then a court might violate the constitutional right to counsel. Fortunately, the Constitution does not require a trial-court judge to navigate this sort of problem. When a defendant elects to represent himself, he is forgoing any Sixth Amendment argument based on the idea that counsel—standby or otherwise—provided insufficient aid.

*Hackett*, 172 N.E.3d at 79–80.

Hackett's challenge to the Ohio Supreme Court's decision is purely legal; he doesn't contest that court's consideration of the facts. So he "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court." *Fields*, 86 F.4th at 231; *see* 28 U.S.C. § 2254(d)(1). And then he must show that the Ohio Supreme Court's decision "was contrary to," or "involved an unreasonable application of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1); *see Fields*, 86 F.4th at 232.

Hackett, however, musters only quotations from *McKaskle v. Wiggins*, 465 U.S. 168 (1984). To be sure, the Court in *McKaskle* remarked—with

59

reference to *Faretta*—that "a trial court *may* appoint 'standby counsel' to assist [a] pro se defendant in his defense." *McKaskle*, 465 U.S. at 170 (emphasis added). But it did not mandate that courts appoint standby counsel, let alone that appointed standby counsel must assist an otherwise pro se defendant. So *McKaskle* offers no support to Hackett.

Hackett offers no basis to conclude that the Supreme Court has ever held that (1) a trial court must appoint standby counsel, or (2) appointed standby counsel must assist an otherwise pro se defendant. Indeed, federal appellate courts have rejected Hackett's premises. *See Wilson v. Hurt*, 29 F. App'x 324, 327 (6th Cir. 2002); *United States v. Mosely*, 810 F.2d 93, 97–98 (6th Cir. 1987); *see also United States v. Cohen*, 888 F.3d 667, 680 (4th Cir. 2018); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997); *cf. Wilson v. Parker*, 515 F.3d 682, 697 (6th Cir. 2008) ("To the extent [standby counsel] failed to act during trial, Wilson merely suffered the consequences of his decision to proceed pro se.").

Given the above, Hackett has not carried his burden under 28 U.S.C. § 2254(d)(1). The Court should thus reject Hackett's fifth ground.

### 6. *Hackett procedurally defaulted his sixth and seventh grounds for relief*

As noted, an Ohio "petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal." *Williams*, 460 F.3d at 806; *see Gerth*, 938 F.3d at 830. As a result, "if an Ohio petitioner failed to raise a claim on direct appeal, which could have

been raised on direct appeal, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806; *see Hicks*, 384 F.3d at 211.

In his sixth ground for relief, Hackett argues that the trial court "improper[ly] instruct[ed] … the jury regarding Count One charge of aggravated murder." Doc. 1, at 13–14. In his seventh and last ground for relief, Hackett argues that the trial court violated his rights under the Sixth and Fourteenth Amendments when it "appointed a private investigator for [Hackett] rather than allowing him to retain his own funds previously allocated by the court." Doc. 1, at 15. Hackett, however, did not raise either of these issues on direct appeal to the court of appeals or the Ohio Supreme Court. *See* Doc. 7-1, at 198–219, 293–309. Given that Hackett could have but did not raise these issues on direct review, they are procedurally defaulted.

As previously noted, Hackett could avoid this result by showing cause and prejudice. As with his third ground, he relies on his appellate counsel's failure to raise these issues on appeal as cause for his procedural default. *See* Doc. 1, at 14–15. But he didn't appeal the Ohio court of appeals' denial of his Rule 26(B) application and thus defaulted this basis to show cause. Moreover, even if Hackett could show cause, he doesn't claim that he can show prejudice. This omission is "fatal" to his effort to show cause and prejudice. *See Thacker*, 841 F.2d 1127, 1988 WL 19179, at *6 n.4; *see also Hockenbury*, 718 F.2d at 160. Further, Hackett does not claim that a "fundamental miscarriage of justice"

will result if his claims are not considered. *Coleman*, 501 U.S. at 750. So he cannot avoid his default.

Hackett argued in his Rule 26(B) application that his appellate counsel was ineffective for failing to argue these issues. *See* Doc. 7-1, at 520–23. As noted with respect to Hackett's third ground, however, a Rule 26(B) application is a vehicle to raise ineffective assistance of appellate counsel; it is not a vehicle to preserve merits arguments. *See Davie*, 547 F.3d at 312. Moreover, as noted, after the court of appeals denied Hackett's application, *see Hackett*, 2019 WL 4413335, he failed to appeal that court's decision to the Ohio Supreme Court.

As to Hackett's sixth ground, the Warden responds as if Hackett challenged in Ohio's courts the jury instructions on his murder charge. The Warden argues that "Hackett did not contemporaneously object to the trial court's jury instruction, and the state appellate court enforced the procedural default and limited its review on direct appeal to plain error review." Doc. 7, at 96. The Warden also says that, aside from the caption to this argument in his appellate brief, Hackett failed to present this issue to the Ohio court of appeals as a federal constitutional issue. *Id*. at 97.

Hackett, however, did not raise any issue before the Ohio court of appeals with respect to the trial court's jury instructions on the *aggravated murder charge*. And the Ohio court of appeals said nothing about the trial court's instruction on this charge. Instead, Hackett challenged the trial court's instruction on the *kidnapping charges*. *See* Doc. 7-1, at 199, 218–19. So the

Warden is mistaken; Hackett did not raise this issue before the Ohio court of appeals.

The Court should reject Hackett's sixth and seventh grounds.

## Conclusion

For the reasons set forth above, I recommend that Hackett's Petition be dismissed.

Dated: April 19, 2024

*/s/James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).